<h1 style="text-align:center">\UNITED STATES DISTRICT COURT<br>DISTRICT OF MINNESOTA</h1>

---

Duy Ngo,

Plaintiff,

v.

Charles Storlie, in his individual capacity
as an officer of the Minneapolis Police
Department; John Doe and Richard Roe,
in their supervisory capacities as ranking
Minneapolis Police officers; and the
City of Minneapolis,

Defendants.

Civ. No. 03-3376 (RHK/JJG)

**MEMORANDUM OPINION
AND ORDER**

---

Robert Bennett, Eric W. Hageman, and Steven E. Rau, Flynn Gaskins & Bennett L.L.P.,
Minneapolis, Minnesota, for Plaintiff.

Joseph E. Flynn, Pierre N. Regnier, and Susan S. Tice, Jardine Logan & O'Brien P.L.L.P.,
Lake Elmo, Minnesota, for Defendant Charles Storlie.

Clifford M. Greene and Monte A. Mills, Greene Espel P.L.L.P, Minneapolis, Minnesota;
James A. Moore, Minneapolis City Attorney, for Defendant City of Minneapolis.

---

<h2 style="text-align:center">INTRODUCTION</h2>

Plaintiff Duy Ngo claims his civil rights were violated when he was shot multiple times by Defendant Charles Storlie while working as an undercover police officer for Defendant City of Minneapolis (the "City") on February 25, 2003. This matter comes before the Court on Defendants' Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court will deny Storlie's Motion and grant the City's Motion.

## BACKGROUND

In the early morning hours of February 25, 2003, Ngo, an officer with the

Minneapolis Police Department ("MPD"), was conducting undercover surveillance for the

Gang Strike Force ("GSF").  (Brimmer Dep. Tr. at 7, 9-10.)  Ngo was sitting in an unmarked

green Buick parked near the intersection of 36th Street and 3rd Avenue in Minneapolis,

dressed in plain clothes[1] consisting of a black hooded sweatshirt with a zip-up front, light

blue jeans, a wig, and a cap.  (Brimmer Dep. Tr. at 10; Ngo Dep. Tr. at 17-18, 33, 35, 253)

Underneath his sweatshirt, Ngo was wearing a bullet-proof police vest with his police badge

and portable microphone attached.  (Ngo Dep. Tr. at 508, 510.)   Ngo's vest had "POLICE"

written in white reflective block lettering on the front and back.  (Ngo Dep. Tr. at 65-66.)

He also had his police badge attached to the upper left side of his vest.  (Ngo Dep. Tr. at

508.)  Ngo was carrying three firearms[2] and several knives.  (Ngo Dep. Tr. at 44, 47-48,

504.)  When he began surveillance, Ngo notified MPD Dispatcher Robin Brimmer of his

location and activity.  (Brimmer Dep. Tr. at 10.)  Based on this information, Brimmer

dispatched a text message on the MPD's computer system: "Gang 115 doing surveillance in

a grn Buick. Area of 36th St/ 3 Av S. Will call Ch 1 when done."[3]  (Bennett Aff. Ex. 3.)

---

[1] Officers with the GSF operate in plain clothes because they do not have an official uniform.  (Olson Dep. Tr. at 21.)

[2] Ngo was carrying two 9 mm Beretta pistols and one .25 caliber Beretta pocket pistol.  (Ngo. Dep. Tr. at 47-48.)

[3] Although Storlie does not recall receiving the text message (see Storlie Dep. Tr. at 36-38), other MPD officers received the message and understood it to mean "keep out of the area" (see Hawes Dep. Tr. at 19, 50).

2

As Ngo was sitting in his parked car in the alley north of 36th Street between Clinton and Third Avenues, a tall black male approached the rear of the vehicle. (Ngo. Dep. Tr. at 19-20.) After a brief verbal exchange, the man pulled out a pistol and thrust it in Ngo's face. (Ngo Dep. Tr. at 34, 37.) Ngo struggled to gain control of the gun, but the man shot Ngo in his lower left abdomen. (Ngo Dep. Tr. at 37.) Ngo continued to struggle and the man fired several more times, putting four bullet holes through the passenger door of Ngo's vehicle. (Ngo Dep. Tr. at 37-39.) Ngo's attacker then pulled away and took off running southbound across 36th Street and into the next alley. (Ngo Dep. Tr. at 41.) Ngo rolled out of his vehicle, ripping open his sweatshirt to "expose his vest and access" his portable microphone. (Ngo Dep. Tr. at 41-43.) He then radioed dispatch from his portable microphone: "Metro Gang 115, emergency, officer shot, 36th and 3rd, suspect running south, southbound in the alley." (Bennett Aff. Ex. 10.) After this first radio transmission was made, Ngo ran southbound in the next alley and repeatedly fired at his attacker. (Ngo Dep. Tr. at 51.) Ngo then made a second transmission to dispatch: "Metro Gang 115. The suspect cut eastbound. Black male, black jacket. Be advised I'm plain clothes. Black male, black jacket, white tennis shoes." (Bennett Aff. Ex. 10.)

Upon hearing Ngo's first transmission, Brimmer dispatched an alert tone[4] on all radio channels: "All cars, officer needs help, officer down 36th and 3rd, squads come to channel 1." (Brimmer Dep. Tr. at 13-16.)  Storlie and his partner, Officer Jamie Conway, were traveling in a squad car approximately 18-20 blocks south of the incident when they heard the alert tone.[5]  (Storlie Dep. Tr. at 156, 203.)  Upon hearing the alert, the officers activated their squad's siren and headed towards the area detailed in the dispatch.  (Conway Dep. Tr. at 51.)  While Conway drove the squad car, Storlie retrieved a weapon, an MP-5 machine gun, from the locked shotgun rack inside the squad car and loaded it.  (Storlie Dep. Tr. at 116-17.)  As the squad car exited the freeway and drove down 36th Street, Conway stopped the sirens and emergency lights because he did not want to alert the suspect to their presence in the area.  (Conway Dep. Tr. at 63.)

After reporting that his attacker had fled the scene, Ngo returned to the mouth of the alley on 36th Street.  (Ngo. Dep. Tr. at 79.)  He began to feel intense pain in his abdomen from the gunshot wound, so he dropped one of his pistols and fell to his knees.  (Ngo Dep. Tr. 89-90.)  Kneeling directly beneath a streetlight, Ngo began waving his arms over his

---

[4] An "alert tone" is a procedure used when an officer needs help; the dispatcher connects all radio channels together, sounds a tone, states "officer needs help," and gives the officer's location.  (Brimmer Dep. Tr. at 14.)  After a call has been "toned," officers must "keep the air clear so that the officer who is needing assistance can further give updates and coordinate whatever the situation is."  (Brimmer Dep. Tr. at 15.)

[5] Storlie recalls hearing only parts of Ngo's two transmissions — he remembers hearing that Ngo's attacker was a black male who fled the scene on foot, but he does not remember hearing that Ngo was operating in plain clothes and conducting surveillance for the GSF.  (Storlie Dep. Tr. at 209, 268, 270-71, 366.)

head in an attempt to flag down a squad car.  (Ngo Dep. Tr. at 86, 634.)  Once Ngo thought

he had caught the attention of an approaching squad car[6], he stopped waving his arms and

fell forward from his kneeling position, dropped his other gun to the ground hear his right

hand, and clutched his left side.  (Ngo Dep. Tr. at 102.)

When Storlie and Conway were within one block of the dispatched area, Conway

observed Ngo in the mouth of an alley.  (Conway Dep. Tr. at 63-64.)  Both Conway and

Storlie believed that Ngo was the suspect at large, and did not observe any indication that he

was a police officer.  (Storlie Dep. Tr. at 212, 231, 364-65; Conway Dep. Tr. at 125, 142-

43.)  Conway stopped the squad car nine to twelve feet from Ngo.  (Storlie Dep. Tr. at 123.)

Both officers simultaneously exited the vehicle and pointed their guns at Ngo.  (Ngo Dep.

Tr. at 98.)  Conway could see a handgun on the ground near Ngo's right hand.  (Conway Dep.

Tr. at 73.)  Neither officer communicated with Ngo or gave him any verbal commands.

(Conway Dep. Tr. at 75-76.)  As Conway had his finger on the trigger of his handgun and

was considering whether to open fire, he recognized Ngo as a police officer and hesitated.

(Conway Dep. Tr. at 74, 164.)  Storlie, however, walked around the squad car door,

advanced upon Ngo, and opened fire with his MP-5 machine gun.  (Ngo Dep. Tr. at 106-07.)

Ngo was thrown down, spun 180 degrees, and thrown backwards by the gunfire, receiving

six gunshot wounds to his left side, groin, and leg areas.  (Ngo Dep. Tr. at 98.)  After the

gunfire ceased, Conway turned to Storlie and said "it's a cop."  (Conway Dep. Tr. at 112.)

---

[6] Neither Storlie nor Conway recall seeing Ngo waving at the squad car.  (Storlie
Dep. Tr. at 122; Conway Dep. Tr. at 141.)

5

The elapsed time between the vehicle stopping and Storlie firing his weapon was only a few seconds.  (Conway Dep. Tr. at 76; Ngo Dep. Tr. at 106.)

On June 6, 2003, Ngo commenced this action alleging claims under 42 U.S.C. § 1983 against: (1) Storlie for the use of excessive force, unjustified use of deadly force, and illegal search and seizure; (2) Storlie's supervisors for authorizing Storlie to carry an MP-5 machine gun[7]; and (3) the City for failure to provide MPD training on identifying plain clothes officers in the field and the unconstitutional custom or practice of allowing officers to use excessive force.  (Compl. ¶¶ 11-28.)  Storlie and the City now move for summary judgment on Ngo's claims.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  For the  purposes of summary judgment, a fact is "material" if its resolution will determine the outcome of the case, and an issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586-87 (1986).  Upon summary judgment motion, the moving party carries the burden of showing there is no genuine issue of material fact, and all evidence and reasonable

---

[7] Ngo has withdrawn all allegations against Defendants Roe and Doe in Count Two of the Complaint, and has agreed to dismiss that claim.  (See Mills. Aff. Ex. 4.)

inferences must be viewed in a light most favorable to the non-moving party.  <u>Celotex Corp.</u>

<u>v. Catrett</u>, 477 U.S. 317, 322 (1986).

**ANALYSIS**

Both Storlie and the City seek summary judgment on Ngo's § 1983 claims.  The

Court will address each Motion in turn.

**I.     Storlie's Motion for Summary Judgment**

Ngo alleges that "[t]his is a civil rights action for money damages for catastrophic

injuries [] suffered when he was shot multiple times without legal justification by [Storlie]

with an MP-5 machine gun in the early morning hours of Tuesday, February 25, 2003."

(Compl. ¶ 1.)  Ngo alleges that "Storlie, under color of state law, violated and deprived Ngo

of his clearly established and well-settled civil rights to be free from: the use of excessive

and unreasonable force, the improper and unjustified use of deadly force and illegal search

and seizure."  (Compl. ¶ 12.)  Ngo contends that Storlie violated his civil rights "either

maliciously or by acting with reckless disregard for whether [his] rights would be violated

by these actions."  (Compl. ¶ 13.)  Based on Storlie's actions, Ngo requests both

compensatory and punitive damages.  (Compl. ¶¶ 14-15.)

Storlie argues that summary judgment is appropriate in this case because he is

entitled to qualified immunity for his actions.  (Mem. in Supp. at 11-32.)  He also contends

that Ngo's request for punitive damages is foreclosed as a matter of law because Ngo

cannot show that his conduct was "motivated by evil motive or intent."  (Mem. in Supp. at

32-34.)  The Court will address each argument in turn.

7

### A.    Qualified Immunity

"Qualified immunity is an entitlement not to stand trial or face other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001). "The privilege is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. at 200-01 (emphasis in original). Under the qualified immunity doctrine, "state actors are protected from civil liability when their actions do not violate clearly established constitutional rights of which a reasonable person would have known." Kuha v. City of Minnetonka, 365 F.3d 590, 601 (8th Cir. 2003). In the context of a summary judgment motion, a court must ask two questions to determine whether qualified immunity is appropriate. Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). "The first question is, taken in a light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right?" Id. (citing Saucier, 533 U.S. at 201). If the court finds that a constitutional right has been violated, it then asks if the right was clearly established at the time of the injury. Id. (citing Saucier, 533 U.S. at 202).

Whether a given set of facts entitles an official to summary judgment on qualified immunity grounds is a question of law. Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994). "[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999).

### 1.    Did Storlie's conduct violate a constitutional right?

The first question in the Court's qualified immunity analysis is whether the alleged

facts, taken in a light most favorable to Ngo, show that Storlie's conduct violated a

constitutional right.  See Craighead, 399 F.3d at 961 (citing Saucier, 533 U.S. at 201).

Since this case presents the issue of whether Storlie used excessive force in violation of

the Fourth Amendment, the question must be analyzed under the "objective reasonableness"

standard.  See Graham v. Connor, 490 U.S. 386, 396 (1989).  "[T]he question is whether the

officer's actions are 'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation."  Id. at 397.  This

standard "is not capable of precise definition or mechanical application."  Id. at 396.

Rather, the "proper application [of the objective reasonableness standard] requires careful

attention to the facts and circumstances of each particular case, including the severity of

the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest

by flight."  Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  "The calculus of

reasonableness must embody allowance for the fact that police officers are often forced to

make split-second judgments — in circumstances that are tense, uncertain, and rapidly

evolving — about the amount of force that is necessary in a particular situation.  Graham,

490 U.S. at 396-97.  "Thus, if the suspect threatens the officer with a weapon or there is

probable cause to believe that he has committed a crime involving the infliction or

threatened infliction of serious physical harm, deadly force may be used if necessary to

prevent escape, and if, where feasible, some warning has been given." Craighead, 399 F.3d at 961 (citing Garner, 471 U.S. at 7).

In seeking summary judgment on Ngo's § 1983 excessive force claim, Storlie argues that his use of force against Ngo was reasonable because he "believed Ngo to be a violent, dangerous assailant who had a firearm [that] had already been used to shoot a police officer." (Mem. in Supp. at 15.)  Storlie relies upon several cases, including Krueger v. Fuhr, 991 F.2d 435 (8th Cir. 1993), and Thompson v. Hubbard, 257 F.3d 896 (8th Cir. 2001), as support for the proposition that the use of a firearm by an officer is objectively reasonable if the officer believes the targeted individual presents "a serious and imminent danger of physical harm."  (Mem. in Supp. at 15-17.)  Storlie points out that Ngo's own witnesses — former MPD Officer Michael Quinn and police procedures expert Lou Reiter — agree that Storlie believed Ngo to be the "bad guy" who had shot a police officer, which shows that Storlie did not consciously elect to shoot a fellow police officer.  (Mem. in Supp. at 13-14.)  Therefore, Storlie contends that he did not violate Ngo's constitutional rights by using deadly force.

In response, Ngo argues that "the deadly force Storlie used on [him] was objectively unreasonable, given the totality of the circumstances."  (Mem. in Opp'n at 19.)  Ngo contends that "no reasonable officer in Storlie's shoes would have believed it was lawful, upon being waved down by a man kneeling in the street, at the exact location where a fellow officer had summoned assistance (after claiming he was shot by a black male), to jump out of his squad car and, without either attempting to positively identify the distinctively Asian-

10

appearing man waving him down, or provide any warning, immediately machine-gun that same unarmed man . . . ."  (Mem. in Opp'n at 19-20.)  Ngo cites <u>Craighead v. Lee</u> as support for the proposition that it was "objectively unreasonable for a police officer to immediately fire a gun under such circumstances."  (Mem. in Opp'n at 36.)  Ngo points out that both Lieutenant Skomra, a MPD Officer and head of the Homicide Division, and Lou Reiter believe that Storlie's actions while approaching and arriving at the scene of the incident were unreasonable.[8]  (Mem. in Opp'n at 11, 16.)  Therefore, Ngo contends that Storlie violated his constitutional rights by using excessive force.

---

[8] Lieutenant Skomra opined on the thought process Storlie should have engaged in while en route to the shooting scene:

> I would really be wondering what I was going to face when I got there and I would have my authorized weapon on me but I would really be worrying about what I had to do with that downed officer.  My primary concern would be am I going to be able to save this officer and get him off.  And actually, the suspect becomes secondary in my mind.

(Skomra Dep. Tr. at 91-92.)  Mr. Reiter commented on Storlie's actions while confronting Ngo at the shooting scene:

> Taking cover under the circumstances faced by Officer Storlie and Conway would have been the only appropriate option, particularly in light of the fact that Officer Ngo was already in a position of disadvantage, down on all fours, he was outnumbered by the two officers, and overpowered by an officer with a tactical automatic weapon and an officer with a handgun.  Even if one were to be faced with an actual suspect, any reasonable and well-trained officer would have recognized that the only acceptable tactic was to utilize cover and make contact with Ngo through verbal commands, while maintaining the position of advantage.

(Bennett Aff. Ex. 23 at 9-10.)

The Court concludes that under the circumstances presented in this case, a reasonable jury could find that Storlie used excessive force against Ngo.  The evidence most favorable to Ngo shows that Storlie received several detailed dispatched messages about Ngo's situation, arrived at the scene, and in a continuous two-second sequence, exited the squad car and fired a machine gun without any verbal warnings or attempts to identify his target.  Genuine issues of material fact exist concerning whether Storlie's actions were "objectively reasonable," including Storlie's use of deadly force without any verbal warnings against a potentially unarmed individual kneeling on the ground beneath a streetlight.  See Saucier, 533 U.S. at 204; see also Garner, 471 U.S. at 11-12 ("deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.").  Most notably, Conway's recognition of Ngo as a police officer and his refusal to use deadly force against Ngo weighs into the reasonableness analysis of Storlie's actions; both Conway and Storlie reacted differently under identical circumstances.  There are also several credibility determinations best left to a jury, including whether Storlie actually heard the contents of several transmissions dispatched over the MPD radio, providing the details of Ngo's situation.  See Craighead, 399 F.3d at 961-62 (the fact that the police officer was in his vehicle when the dispatcher broadcast details about a shooting situation contributed to the objective unreasonableness of his decision to fire his gun).  Accordingly, because a reasonable jury could conclude that Storlie used excessive force, Ngo has established a violation of his constitutional rights under the Fourth Amendment.

**2.      Was Ngo's constitutional right clearly established?**

12

The second question in the Court's qualified immunity analysis is whether Ngo's

constitutional right was clearly established at the time he was injured by Storlie.  See

Craighead, 399 F.3d at 961 (citing Saucier, 533 U.S. at 202).  The United States Supreme

Court has noted

> [t]he concern of the immunity inquiry is to acknowledge that reasonable
> mistakes can be made as to the legal constraints on particular police conduct.
> It is sometimes difficult for an officer to determine how the relevant legal
> doctrine, here excessive force, will apply to the factual situation the officer
> confronts.  An officer might correctly perceive all of the relevant facts but
> have a mistaken understanding as to whether a particular amount of force is
> legal in those circumstances.  If the officer's mistake as to what the law
> requires is reasonable, however, the officer is entitled to the immunity
> defense.

Saucier, 533 U.S. at 205.  Qualified immunity operates "to protect officers from the

sometimes hazy border between excessive and acceptable force . . . and to ensure that

before they are subjected to suit, officers are on notice that their conduct is unlawful."  Id.

at 206.  Therefore, if Storlie's mistaken belief that the situation required use of deadly

force was reasonable, he is entitled to qualified immunity.  See id.

Storlie argues that his decision to use deadly force was reasonable because he was

"faced with a split-second decision in the context of a volatile atmosphere involving a

subject who was believed to constitute a threat of serious bodily harm or death to the

officers."  (Mem. in Supp. at 29.)  Storlie contends that "while it is unfortunate that Ngo

was shot, the inquiry is not into Ngo's state of mind or intentions when he encountered

Storlie and Conway, but whether, from an objective viewpoint and taking all factors into

consideration, Storlie reasonably feared for his life."  (Mem. in Supp. at 29.)  Storlie cites

Parks v. Pomeroy, 387 F.3d 949 (8th Cir. 2004), arguing that "police officers cannot be expected to delay or to second-guess a decision that must be made in the heat of a dangerous confrontation with a person engaged in violent criminal conduct." (Mem. in Supp. at 23-24.)  He also argues that "there is no clearly established law to demonstrate that the use of deadly force on [an individual] who had attempted to kill one officer and who was close to a source of weapons, [is] unconstitutional." (Mem. in Supp. at 25-26.)  Therefore, Storlie claims that he is entitled to qualified immunity in this case.

Ngo counters that "Storlie fails to mention any of the cases that are most relevant to the Court's determination in this matter — police 'friendly fire' shooting cases in which an officer shoots another officer." (Mem. in Opp'n at 2.)  Citing several cases from the First, Third, and Ninth Circuits, Ngo argues that "all of the 'friendly fire' cases have found that the shooting officer was not entitled to qualified immunity" by concluding that "a reasonable officer would not have made such a misidentification." (Mem. in Supp. at 2, 31-33.)  Therefore, Ngo contends that Storlie is not entitled to qualified immunity.

The Court concludes that under the circumstances of this case, a reasonable jury could find that Storlie's use of excessive force against Ngo was not a reasonable mistake. "At least since Garner was decided nearly 20 years ago, officers have been on notice that they may not use deadly force unless the suspect poses a *significant threat of death or serious physical injury* to the officer or others." Craighead, 399 F.3d at 962 (emphasis added).  In Craighead, a police officer responded to a dispatched alert of gunfire and in a three-second continuous sequence, exited his squad car, aimed his shotgun at two men

wrestling for control of a gun, and fired without warning.  Id. at 960.  The Eighth Circuit

determined that "the record here does not conclusively establish the reasonableness of the

officer's actions," and upheld the district court's denial of qualified immunity for the

shooting officer.  Id. at 962.  Like Craighead, genuine issues of material fact exist in this

case concerning whether Storlie's use of excessive force was reasonable.  Although

Storlie's claim that "police officers cannot be expected to delay or second-guess a decision

that must be made in the heat of a dangerous confrontation with a person engaged in violent

criminal conduct" is undeniably correct, the question remains whether Storlie made a

reasonable mistake in identifying Ngo as the targeted suspect engaged in violent criminal

conduct.

Furthermore, the "friendly fire" cases cited by Ngo are persuasive in this instance.

In cases involving a police officer shooting another police officer, courts have generally

concluded that the shooting officer is not entitled to qualified immunity because the court

cannot say, as a matter of law, that the shooting officer made a reasonable mistake in

shooting a fellow officer; courts allow a jury to decide whether the shooting officer's

actions were objectively reasonable.  See Young v. City of Providence, 404 F.3d 4 (1st Cir.

2005) (reversing summary judgment in favor of officer who shot fellow officer by finding

that a reasonable officer would not have made such a misidentification); Wilkins v. City of

Oakland, 350 F.3d 949 (9th Cir. 2003), cert. denied, 543 U.S. 811 (2004) (upholding

denial of summary judgment for officers who shot and killed fellow officer); Curley v.

Klem, 298 F.3d 271 (3d Cir. 2002) (no qualified immunity for officer who mistakenly shot

another officer without taking time to assess the circumstances); Jensen v. City of Oxnard, 145 F.3d 1078 (9th Cir. 1998), cert. denied, 525 U.S. 1016 (1998) (no qualified immunity where officer shot fellow officer "in conditions in which he should have been able to recognize that the figure he was shooting was a fellow officer").  Although Storlie is correct in arguing that Ngo's status as a police officer does not alter the analysis, and that the facts of the "friendly fire" cases cited by Ngo are distinguishable (see Reply Mem. at 1-3), the general principle from the cases is applicable here.  Genuine issues of material fact exist concerning whether Storlie's failure to recognize Ngo as someone other than the targeted suspect was reasonable, evidenced in part by Conway's recognition of Ngo as a police officer and refusal to use deadly force.

Under the circumstances in this case, a reasonable jury could conclude that Storlie used excessive force against Ngo and such usage was not a reasonable mistake.  See Saucier, 533 U.S. at 201.  "[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street, Graham will not permit summary judgment in favor of the defendant official."  Id. at 216.  Accordingly, Storlie is not entitled to qualified immunity, and his Motion for Summary Judgment on that issue will be denied.

## B.    Punitive Damages Claim

Based on his § 1983 claim against Storlie, Ngo requests punitive damages.  (Compl. ¶ 15.)  Punitive damages may be awarded against individuals in § 1983 actions where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involved

reckless or callous indifference to the federally protected rights of others."  Smith v.

Wade, 461 U.S. 30, 56 (1983).  According to the Eighth Circuit,

> [p]unitive damages are awarded to punish the defendant for his [or her] willful
> or malicious conduct and to deter others from similar behavior.  The focus,
> in determining the propriety of punitive damages in § 1983 actions, is on the
> intent of the defendant, and whether the defendant's conduct is of the sort
> that calls for deterrence and punishment over and above that provided by
> compensatory awards.

Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir. 1997) (internal citations omitted).

According to Storlie, "there is simply no evidence of any evil motive or intent such

that would allow [Ngo] to pursue punitive damages."  (Mem. in Supp. at 34.)  Storlie

contends that he "shot an individual whom he perceived to be the suspect who had just shot

a police officer," and Ngo's witnesses acknowledge that Storlie "did not intentionally shoot

[Ngo] knowing he was not a criminal suspect, but rather it was a mistake."  (Mem. in Supp.

at 33.)  Ngo counters that punitive damages can be awarded for conduct involving reckless

or callous indifference to the injured individual's constitutional rights.  (Mem. in Opp'n at

41.)  He contends that not only was Storlie's use of deadly force unreasonable, but it was

also highly excessive.  (Mem. in Opp'n at 16, 18, 25.)  Therefore, Ngo argues that his

request for punitive damages should remain part of his § 1983 claim against Storlie.

Based on the submissions of the parties, the Court has serious reservations

concerning whether there is sufficient evidence from which a jury could reasonably

conclude that Storlie's actions were willful and malicious, or that he acted with reckless or

callous indifference to Ngo's constitutional rights.  Rather than rule on the punitive

damages claim at this time, the Court will resolve the punitive damages issue at trial after the record has been fully developed.

## II.     The City's Motion for Summary Judgment

Ngo alleges two claims against the City for (1) "failure to train its officers to combat the potential for high risk encounters with, and misidentifications of, plain clothes officers in the field," and (2) failing to issue meaningful discipline or sanctions for use of excessive force by MPD officers, constituting a "custom or usage with the force of law." (Mem. in Opp'n at 3, 26.)  Ngo contends that the City, "with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, or thereafter ratified a custom, pattern and practice on the part of its police personnel, including Storlie, of unjustified, unreasonable and illegal use of excessive force, including deadly force, and improperly issued and authorized the use of MP-5 and M-4 machine guns."  (Compl. ¶ 25.) Ngo claims that "as a direct and proximate result of the aforesaid acts and omissions, systematic flaws, customs and policies of [the City], Storlie shot Ngo in violation of his civil rights . . . ."  (Compl. ¶ 27.)  Therefore, Ngo seeks to hold the City liable for his injuries.

The City can be held liable under § 1983 for constitutional violations resulting from its failure to adequately train its employees if the failure to train rises to the level of "deliberate indifference."  See Larkin v. St. Louis Hous. Auth., 355 F.3d 1114, 1117 (8th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 380 (1989)).  The City can also be held liable under § 1983 if Ngo proves that an unconstitutional municipal "custom"

18

caused a violation of his rights.  See Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  The Court will address each claim in turn.

**A.      Failure to Train**

Ngo contends that the City "fail[ed] to train its uniformed officers in avoiding the misidentification of plain clothes officers in the field" and "a large body of evidence from the City's own witnesses . . . establishes the City's deliberate indifference to the obvious need for specific training and protocols in this area."  (Mem. in Opp'n at 4.)  "At any given time in [the City] there are more than half a dozen, to at least a dozen, law enforcement agencies employing officers in plain clothes or undercover capacities."  (Mem. in Opp'n at 4; Brubaker Dep. Tr. at 42-44.)  These agencies include the Metro GSF, the Minnesota Bureau of Criminal Apprehension, the Drug Enforcement Agency, and the Federal Bureau of Investigation.  (Brubaker Dep. Tr. at 43.)  In addition, off-duty MPD officers have discretion to take action at any time, regardless of whether they are in uniform or not. (Bennett Aff. Ex. 35.)  Ngo was doing plain clothes surveillance when he was shot and injured by Storlie on February 25, 2003.  (Brimmer Dep. Tr. at 10.)

A claim against a municipality for an alleged failure to train its officers cannot succeed unless an officer violated the plaintiff's constitutional rights.  Neal v. St. Louis Bd. of Police Comm'rs, 217 F.3d 955, 959 (8th Cir. 2000).  As discussed above, genuine issues of material fact exist concerning whether Storlie violated Ngo's Fourth Amendment rights by using excessive force against him.  Therefore, Ngo has satisfied this threshold inquiry for the purposes of summary judgment.

Next, Ngo must provide evidence showing that the City was on notice that its

training procedures "were inadequate and likely to result in the violation of constitutional

rights."  See S.J. v. Kansas City Public School Dist., 294 F.3d 1025, 1029 (8th Cir. 2002).

There are two ways to prove such notice.  First, Ngo may show that the City's failure to

train "is so likely to result in a violation of constitutional rights that the need for training is

patently obvious."  See Larkin, 355 F.3d at 1117 (quoting S.J., 294 F.3d at 1029).  Second,

he may show that "a pattern of misconduct indicates that [the City's] responses to a

regularly recurring situation are insufficient to protect the [people's] constitutional rights."

See id. (quoting P.H. v. School Dist. of Kansas City, 265 F.3d 653, 660 (8th Cir. 2001)).

In this case, several witnesses have given opinions on the misidentification training

issue.  Former Chief William McManus testified that the "potential of misidentification"

exists and "if there is a misidentification, at least friendly fire is potential and injury a

likely result."  (McManus Dep. Tr. at 80-82.)  William Micklus, the City's police practices

expert, labeled the potential for a shooting between a uniformed MPD officer and a plain

clothes officer as "high risk but low frequency."  (Micklus Dep. Tr. at 26.)  Lou Reiter,

another police practices expert, believes that "in the last 20 some years there is about 27

[police officers] who have actually been killed in [friendly fire situations] . . . it's not an

unknown issue and we know that it creates this high potential."  (Reiter Dep. Tr. at 93.)

According to Mr. Reiter, the "training conducted and supervision exercised by [the City]

with respect to misidentification of plain clothes officers was inadequate."  (Bennett Aff.

Ex. 23 ¶ 45.)  Several MPD officers, including Storlie, have not received any extensive

training from the MPD on misidentification issues.  (Storlie Dep. Tr. at 305; Campbell

Dep. Tr. at 28; Setzer Dep. Tr. at 13-15; Gerold Dep. Tr. at 73.)  Based on this testimony,

and Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005), Ngo argues that the City's

failure to train its officers on the misidentification issue caused his injury.  (Mem. in Opp'n

at 13.)

The City counters that "Ngo's suggestion that [its] training is deficient regarding

identifying and distinguishing plain clothes officers from other members of the public in

potential deadly-force situations is irrelevant as a matter of law, unsupportable as a matter

of law, and baseless as a matter of fact."  (Mem. in Supp. at 17.)  The City relies on City of

Canton v. Harris, 489 U.S. 378 (1989), arguing that "courts are not in the business of

endlessly second-guessing municipal employee training programs."  (Reply Mem. at 5.)

Furthermore, the City claims that "[w]hile Ngo's Opposition [Memorandum] makes much

commotion about the City's lack of misidentification-avoidance training, it fails to provide

specific facts explaining what such training would look like (besides the training the City

already provided)."  (Reply Mem. at 4.)  Therefore, the City seeks summary judgment on

the failure to train claim.

The Court concludes that summary judgment on Ngo's failure to train claim is

appropriate.  No court in the Eighth Circuit has found that municipalities have a

constitutional duty to train police officers to approach a shooting suspect in a manner that

accommodates the possibility that the suspect might be a police officer in plain clothes.

While Young v. City of Providence speaks to a similar issue, the case is not binding

precedent and is distinguishable.  Furthermore, in order for this Court to seriously

contemplate following the holding in Young, it would need some evidence of what

identification training was lacking here.  Neither Ngo nor his witnesses has identified any

specific training that would have prevented Storlie's mistaken perception that Ngo was the

suspect-at-large.  The absence of some hypothetical, speculative, and unknown training

could not have directly caused Ngo's constitutional injury.

Even if misidentification training was constitutionally required by the Eighth

Circuit, Ngo has not presented sufficient evidence showing that the City was on notice that

its plain clothes identification training procedures "were inadequate and likely to result in

the violation of constitutional rights."  See S.J., 294 F.3d at 1029.  Ngo has not shown that

the City was aware of a "patently obvious" need for identification training, or that a pattern

of misidentification indicated a need for training.  See Larkin, 355 F.3d at 1117.  The City

does provide some training on identification of plain clothes officers in the field, as

testified to by Michael Quinn, a former Supervisor of the Minneapolis Police Academy:

> Q: In your training of Minneapolis police officers do you recall presenting
> officers with training where the trainee or the examinee had to consider
> whether an individual was a suspect and that the suspect turned out to be an
> off duty or undercover police officer?
>
> A: Yes.
>
> Q: The idea was to train Minneapolis police officers in distinguishing the
> cops from the non-cops?
>
> A: Correct.

Q: Do you have any reason to believe that the FATS training has stopped at the Minneapolis Police Department since you left? And when I say FATS, I mean either FATS or Range 2000 or Range 3000 as it's called.

A: No, as far as I know it's still being used.[9]

(Quinn Dep. Tr. at 248-49 (footnote added).) Ngo acknowledges his experience with such training. (Ngo Dep. Tr. at 593-94.) Therefore, the City has not ignored a "patently obvious" need for some training on plain clothes officer identification. See Larkin, 355 F.3d at 1117. Furthermore, there is no evidence indicating that the City ignored a "pattern of misidentification." Id. To the contrary, several witnesses identified this case as a rare situation — the first time in Minneapolis history that one officer shot another officer due to mistaken identity. (Ngo Dep. Tr. at 665; Gerold Dep. Tr. at 29; Lubinski Dep. Tr. at 85-86; Altonen Dep. Tr. at 26; Edinger Dep. Tr. at 9-10; Folkens Dep. Tr. at 39; Jorgenson Dep. Tr. at 64.) In fact, Larry Brubaker, a retired FBI Agent, believes that this was the first such shooting in Minnesota history. (Mills Aff. Ex. 39 at 3.) Ngo has failed to show that plain clothes officer identification training is constitutionally required or that the City was on notice of an obvious need for extensive training. Accordingly, summary judgment will be granted on Ngo's failure to train claim.

### B.     Unconstitutional Custom Claim

Ngo also alleges that the City maintains an unconstitutional "custom" of failing to discipline MPD officers for the use of excessive force. (Mem. in Opp'n at 25-37.)

---

[9] FATS training was first used by the Minneapolis Police Academy in 1996, and continues to be used in annual officer training. (Sullivan Aff. ¶¶ 4-6.)

Specifically, Ngo claims that the "MPD's custom or practice of indifference and inaction led to Storlie's immediate use of his MP-5 without fear of discipline or consequence." (Mem. in Opp'n at 28.)  To establish the existence of an unconstitutional municipal custom, a plaintiff must satisfy three requirements:

> (1) the existence of continuing, widespread, persistent pattern of unconstitutional conduct by the governmental entity's employees;

> (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

> (3) proof that the alleged custom was the moving force behind the alleged constitutional violation.

Mettler, 165 F.3d at 1204 (citations omitted).  Ultimately, Ngo must show that the City's alleged custom "directly caused" Ngo's constitutional injury.  See Gatlin v. Green, 362 F.3d 1089, 1094 (8th Cir. 2004) (citing  Monell v. Dept. of Social Servs., 436 U.S. 658, 690-91 (1978)).

Ngo claims "MPD officers knew that officer misconduct of all sorts could be perpetrated with impunity and without fear of negative consequence."  (Mem. in Opp'n at 36.)  Ngo points to evidence of an MPD internal investigation conducted concerning excessive force complaints filed between 1999 and 2003, as well as three federal cases settled in 2004[10], arguing that these situations "provide further evidence of the complete

---

[10] Ngo cites the following: Polley v. City of Minneapolis, U.S. District Court File No. 03-3518 (RHK/JSM); Hagen v. Palmer, U.S. District Court File No. 02-4318 (RHK/AJB); Streich v. Boeltl, U.S. District Court File No. 03-117 (PAM/RLE).  (Mem. in Opp'n at 33.)

lack of accountability in the MPD."  (Mem. in Opp'n at 32-33.)  Therefore, Ngo contends that sufficient evidence exists to prove his unconstitutional custom claim.

The City counters that "Ngo points to a hodgepodge of allegations but cannot approach his substantial burden" of proving an unconstitutional custom claim under Mettler.  (Mem. in Supp. at 29.)  The Court agrees and concludes that Ngo has not presented a genuine issue of material fact concerning whether the City maintained an unconstitutional custom of failing to discipline its officers for use of excessive force. Ngo has not shown "the existence of a continuing, widespread, persistent pattern of unconstitutional conduct" by the City's MPD officers.  Mettler, 165 F.3d at 1204.  Both Ngo and one of his witnesses, Michael Quinn, a former Supervisor of the Minneapolis Police Academy, deny the existence of widespread civil rights abuse in the City, testifying that MPD officers truthfully and honestly respond to complaints.  (Ngo Dep. Tr. at 604; Quinn Dep. Tr. at 203-06.)  Furthermore, the three federal cases cited by Ngo did not involve deadly-force shootings, so they are distinguishable from the present situation.  Ngo has also failed to show "proof that the alleged custom was the moving force behind the alleged constitutional violation."  See Mettler, 165 F.3d at 1204.  Several of Ngo's witnesses maintain that Storlie acted outside the parameters of the City's policies and training when he shot Ngo, indicating that Storlie, rather than an alleged unconstitutional custom, was the moving force behind Ngo's shooting.  (Quinn Dep. Tr. at 237-38; Reiter Dep. Tr. at 89-90.)  Ngo has not presented sufficient evidence to maintain a viable § 1983

claim against the City for maintaining an unconstitutional custom.  Accordingly, the City's

Motion for Summary Judgment on Ngo's custom claim will be granted.

## CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, it is

**ORDERED** that

(1)     Storlie's Motion for Summary Judgment (Doc. No. 111) is **DENIED** with

respect to the qualified immunity issue, and the punitive damages claim will

continue under advisement and be resolved at trial;

(2)     The City's Motion for Summary Judgment (Doc. No. 116) is **GRANTED**,

and all claims against the City are **DISMISSED WITH PREJUDICE**; and

(3)     The City's Motion to Strike (Doc. No. 150) is **DENIED**.[11]

---

[11] The City has filed a Motion to Strike Exhibits 54-64 to the Affidavit of Robert
Bennett, which was submitted in opposition to summary judgment.  The City seeks to strike
Exhibit 54 — an Affidavit of Robert Bennett dated December 1, 2004 — on grounds that
"Ngo's answers to the City's Interrogatories did not identify Robert Bennett as a witness,"
and the Exhibit is "riddled with hearsay and speculation."  (Mem. in Supp. at 2.)  However,
Exhibit 54 was previously submitted in this case without objection more than one year ago
as part of Ngo's Motion to Compel (Doc. No. 33).  Therefore, the City's Motion to Strike
Exhibit 54 is denied.  The City also moves to strike Exhibits 55-64 — several records with
exhibits pertaining to internal MPD investigations — on grounds that "Ngo did not disclose
[these] items in response to the City's Interrogatories and Document Requests."  (Mem. in
Supp. at 2.)  Regardless of whether Ngo provided full copies of each document with his
opposing memorandum, the City has access to such documents because the MPD created
or acquired each document during the previous internal investigations of other officers.
Therefore, the City's Motion to Strike Exhibits 55-64 is also denied.

Dated: June 2, 2006                             s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge